Good morning, your honors. My name is David Barton. May it please the court, I represent ASARCO in this case, the defendant and appellant. We are here today to ask this court to undo a constitutional wrong. The wrong began when the district court allowed into evidence highly prejudicial and irrelevant evidence relating to graffiti that two men saw in a workplace. This case involved a situation of unlawful harassment and discrimination against a woman based on a hostile work environment that she claimed was hostile toward women. Yet the court allowed this evidence in, and it obviously swayed the jury. Abusive discretion review? Absolutely abusive discretion. Why did the district judge abuse his discretion in allowing in evidence that apparently was directed at this plaintiff? Well, it was. Because she was the only person who used that restroom. That is correct. It was abusive discretion for a number of reasons. It had absolutely no connection to this plaintiff at all. The first incident occurred two years before she began employment at ASARCO. The second incident occurred nine months after she left. She had no knowledge of them. She was completely unaware of them. And so it was not the same actor. So it was evidence that should not have been allowed in. Admittedly, it's not relevant for some purposes. Why is it not relevant to show the attitude of management towards this kind of abusing the restroom? Why doesn't the fact that the management essentially did nothing about it in the past bear on the understanding of the plaintiff's fellow employees as to no harm, no foul? Well, first, the plaintiff in this case didn't know about the other instance, so it wouldn't have been. No, not her state of mind, management's state of mind. The problem is that the court, the district court allowed it in to prove reprehensibility in response to ASARCO's motion in limiting. That was the reason the court allowed the evidence in. Did you request a limiting instruction? We did request a limiting instruction. And was it given? There was a limiting instruction given. Unfortunately, the limiting instruction couldn't cure the error here. The bell had already been rung. Go back to Judge Singleton's question. And why isn't this evidence that goes to the punitive damages issue? The question is whether the conduct was reckless, and what we have is repeated incidents both before and after the employment that deal with the same kind of issue that the plaintiff raises. Why isn't that evidence of reprehensibility? Because it can't be, Your Honor. Punitive damages certainly were the reason why the court allowed the evidence in, and the evidence was also cited by the court in response to our motion under Rule 50 to support the punitive damages award. But if you look at the State Farm case in State Farm v. Campbell, the Supreme Court said, and I quote, "... due process does not permit courts in the calculation of punitive damages to adjudicate the merits of other parties' hypothetical claims against a defendant under the guise of reprehensibility." But State Farm is quite different. State Farm is a question of whether or not parties not then before the court have been injured in some way, and therefore it would be appropriate to award punitive damages to deter other conduct. Here the notion, right or wrong, you have the district judge abused his discretion, he abused it. District judge lets this in to show that this, that the, that this wasn't simply negligent conduct on the part of ASARCO. ASARCO is engaged in a pattern of practice of not remedying these problems. Why isn't, why isn't that within the district judge's broad discretion? Because every case that has addressed the question of whether or not other acts' evidence should come into evidence has had to find that there's some linkage, some tie to the present case. Why isn't the state of mind of management the link? Because there was no evidence that the same management, for example, made the decision to paint over the graffiti that Ms. Aguilar saw, for example, or the same manager made the decision to remove the graffiti from the bathroom that Mr. Esquivel  saw. Scalia. But it's the same company. It is the same company, Your Honor. But again, there's no linkage to this particular case. So you result in a trial within a trial where we're having to prove every incident of graffiti was appropriately dealt with. And that's not the test here. The test is what happened to this particular plaintiff to justify the punitive damages in this case. And State Farm is very clear on that. You can't use other bad acts to justify punitive damages in a case when those bad acts are not substantially similar to the conduct at question here. But, counsel, you seem to be saying that a court decision that says that it is inappropriate to tell a jury that in calculating punitive damages they should consider not only what happened to the plaintiff, but also what happened to everyone else, that that's not appropriate. And you're saying that's the same thing as saying in determining whether the company properly reacted in the past and, therefore, sent a message to its employees as what was acceptable and what is unacceptable in the context of this company, the jury can consider what they did when this happened in the past. Those are two entirely different things, aren't they? I guess if I understand the question correctly, I think what you're saying is if the evidence was admitted only to show what the response was to this graffiti, then that would be one thing. But that's not the case. There was no testimony or evidence about what the response was. It was simply testimony about what had happened. It was introduced to show that there was horrible graffiti in the workplace at Asarco. There wasn't – it wasn't introduced for the purpose of showing the reaction. If there were – if the question were what was the reaction, then they would have put on managers to talk about what the reaction was. Asarco actually was prohibited from doing that because the court's limited instruction allowed this evidence in only for the very limited purpose of showing that it happened in the past. And so you're correct. I mean, I guess if the question were was there testimony or evidence or was this discussion about Asarco's response, then that's one thing. But what actually happened was we had these horrible pictures of graffiti that were shown to the jury to show how bad the graffiti at Asarco is. So it really didn't focus on that question. And I want to give you time to get on to what I think is the major issue. Yes, I was going to suggest, counsel, you might be using your time more effectively if you tell us about the punitive damages issue. Having said that, before you get there, let me just ask one more question about this. I understood reading the record in this case, Asarco's defense was essentially, look, these were isolated incidents along the way that the plaintiff is complaining of if they occurred. He claimed it didn't occur, but the jury thought they did. And so they're really not the stuff of punitive damages and they're really not the stuff of punishment. If that's the case, if your defense is we're not those kind of people, I guess I'm having difficulty understanding why they're not entitled to put in evidence that you are that kind of people. Well, because, again, it goes to does our client allow this kind of thing in its workplace? Not does it happen. I mean, there's graffiti everywhere in this country. One cannot eliminate from everybody's hands the magic markers of idiots. And so you find yourself with graffiti in bathrooms all around the country. The question is what did management do in response to it? And if that were the focus of this evidence, if the question were, well, the evidence presented was that Asarco just didn't do anything about it, then that's one thing. But what we actually see here is that Asarco painted over the graffiti that Ms. Aguilar saw. The only pictures she had of the graffiti were painted over, which is important. It shows, in fact, that the graffiti had been painted over. On the other hand, the graffiti that was introduced by Mr. Esquivel wasn't produced in its painted-over state, which it, too, was eventually. It was presented after. Had it introduced into evidence, the painting over eventually? Of Ms. Aguilar's graffiti, yes, but not of Mr. Esquivel's. The picture didn't show the painting over. Were you allowed to present evidence that it was painted over? We did. We did have testimony of the supervisor involved did come in and say that he went down with Mr. Esquivel and painted it over. Okay. All right. Now that I've distracted you again from the issue, it's really interesting. Getting to punitive damages. It is a very interesting issue in this case, Your Honor, is what does this Court have to do with the punitive damage award? Because here we have nominal damages, a dollar in damages, a special verdict form that asks the jury to determine what her actual damages were, whether they were future or past emotional harm, and they said zero. And yet they award $860,000 in punitives. And we argue the evidentiary issue because it's important, because we think the only logical explanation for that award is that it's a punitive damage. Okay. But assume you lose on that. Okay. Because if you win on it, we don't get the punitive damage. That's correct. So assume you lose on it. Okay. Assuming that the Court does not find abuse of discretion in admitting the evidence, then the Court has to figure out why it is that punitive damage award was entered and determine whether the punitive damage award is appropriate under the Gore State Farm analysis. And I don't think I need to bore you with the details of the Gore State Farm analysis. I think the Court is quite comfortable with what it says. Well, this is 300,000 to 1, and Gore tells us to be speculative or at least be concerned if the ratio is more than two digits. That's right. A single-digit multiplier needs to be applied. That's what Gore and State Farm teach. That is correct. What I'm interested in is the context of Title VII. Congress has capped all damages at 300,000. As I read Gore, what the Supreme Court was saying is, look, it's unfair that a defendant, when faced with a potential penalty, which is what a punitive damages award is, doesn't know what the potential award is. And so one way to make sure of that is we look at the compensatory award, and we say there's a multiplier and you shouldn't go past the multiplier. The Fifth Circuit has suggested that in these kinds of cases where Congress gave ample advance notice that the maximum penalty available was $300,000, that that ratio analysis shouldn't apply. Could you respond to that? Yes. With all due respect to Abner and the Fifth Circuit case, that case actually scans the Gore analysis on its head. If we look at the $300,000 cap, and it is a cap, not a target, if we look at that $300,000 cap as the maximum amount available in any Title VII case, then we have to then have a scale. That's what Gore teaches. Gore teaches you're going to have to apply, put punitive damages on a scale, where the most egregious cases get the maximum amount of punitive damages. And so that's what Abner does, actually, is exactly the opposite. It says no. In all nominal damages cases, the cases where the zero amount of damages are awarded, you can give the maximum. Well, doesn't it suggest something a little bit different? It suggests you still need to do the first and third prongs of the BMW analysis to see how reprehensible the conduct was and what the state of mind of the defendant was. But that playing around with percentages in those kinds of cases is not terribly important, because the function of the second question in Gore, which is advance notice to the defendant, has already been served by the statute. Well, there's certainly three components to the Gore analysis, and you have to apply all three. What I have a problem with with Abner is that the Court simply said the second component means nothing in cases where there are nominal damages. And that, quite frankly, is troubling, because it has to mean something, because it allows the Court to kind of compare these cases one with another. So if it means something, is it your position that the jury is limited or the Court is limited to $10 in punitive damages in cases that might involve, assume the first and third prongs are satisfied? Very reckless or intentional conduct and very reprehensible conduct, but it's just doesn't damage the defendant very much, is how is the – how is the – and we have a statute that itself provides for punitive damages. How is the purpose of the statute served if the jury is limited to $10 in those cases? All we're asking the Court to do is follow the Supreme Court precedent. And the Supreme Court precedent says that in all but the rarest of cases, you have to apply this ratio. And so you – and the Court carved out two exceptions, right? The Court carved out in State Farm and Gore two exceptions to the racial rule. And one was these extreme – these cases where there's a low damage amount, but particularly egregious acts by the defendant. And so that would be one case, obviously. And for example, in Mendez, this Court determined that that was an exception case. The defendant's conduct met the exception. Our contention here is that this is not an exceptional damages case. This is not a case where there was particularly egregious acts. Sotomayor, you're 100 percent correct that the jury found no actual damages. And that under our case law, followed by the district court, that's the equivalent of a $1 nominal damage award. But it is incorrect to suggest that the only relief the plaintiff obtained was that $1. She also got injunctive relief. How do we value injunctive relief in determining the appropriateness of the punitive damage award? In other words, you vigorously opposed her injunction. She nevertheless got an injunction saying, you've done it wrong in the past. This is the way you'll do it in the future. Why does that not suggest that the evidence that supports that injunction also supports something more than $10 in punitive damages? A couple reasons, Your Honor. First of all, the injunctive relief was not considered by or awarded by the jury. So the amount of punitive damages which was, I think you've got the same decision maker you've got to consider. If the punitive damages are awarded only by the jury, then we have to look at the evidence they considered and the remedies they awarded. Secondly the jury have to consider the same kinds of evidence in making its punitive damage award that the court had to consider in determining the appropriateness of injunctive relief. Yes, but I would contend that the Court's decision in that regard is clearly erroneous, Your Honor. If you look at the record, there is no dispute that the training and the policy that the Court actually ordered ASARCA to perform were already in place. You haven't appealed that portion of the Court's – I mean, your brief doesn't at least suggest that you're contending to us that if the – that the Court erred in granting injunctive relief. You're making arguments that the Court erred in admitting evidence or awarding punitive damages, but I don't see anything in your brief about the Court erring in granting injunctive relief. We did not, Your Honor, contend that there was an error in granting the injunctive relief on this appeal. That is correct. It was a part of our Rule 50 motion, but it was not – and it addressed the attorney's fees issue, excuse me, but it wasn't as it pertains to the punitive damage award itself. So let's assume that, as Judge Singleton suggested, we think this is a case in which the first and third prongs of BMW v. Gore are met. What is the appropriate punitive damages award? Let's assume it is one of those rare cases. The million-dollar question. Yeah. Or the $300,000 question. I think you want to go in the other direction, counsel. Sorry. The $12 question. The $9 question. The – there are two ways I think the Court can take this. First of all, the Court could simply apply Gore and State Farm and say, look, we've been told repeatedly that this case, the multiplier needs to be a single-digit multiplier. I asked you to assume this is one of those rare cases. Okay. And we do have Mendez, which allowed a 2,500 to 1. Correct. And I actually would suggest that you follow Mendez, okay? Let's take a look at this case in the light of Mendez and say, all right, if Mendez was an egregious case where we were allowed to exceed the ratio, then what are we going to do with this case? You have to compare the facts in this case with those in Mendez, understanding that the cap is the maximum amount a plaintiff in any case like this is going to get, $300,000. And you need to leave room at the top of that scale for more egregious cases. There are no doubt going to be more egregious cases, cases where an employee is raped, cases where the management had no policy, cases where there's repeated events that have been ignored by management. That's not our case. Is $300,000 the relevant number? It's the cap, but the jury returned a punitive damage as verdict of 850-plus somewhere in that area. That's correct. Isn't it that number that we ought to be comparing to other cases rather than the 300? They'll all be reduced to 300. The worst case in the world will be reduced to 300. So isn't that the question? No, Your Honor. Since they'll all be reduced to $300,000, it is the number the court should be considering. There can't be a punitive damage award in a Title VII case that exceeds $300,000. It's the only number the court considers. But in figuring whether the jury acted appropriately, don't we look at the amount that it actually awarded, recognizing that we're going to have to reduce it later? I need to reserve a little bit of my time. But, yes, the number of the – looking at the amount the jury awarded, we should be looking at what is the maximum that can be awarded in this case. $300,000 is the maximum in any of these cases. $2,500 was the amount the court in Mendez decided was appropriate on those facts. So you compare these facts to Mendez, and I think to answer your question, you get to a number that is south of $2,500. That's the amount that should be given. Now, so you want to reserve your time? I'm going to reserve the rest of my time. You may do so. Thank you. We'll hear from the – this is the plaintiff. That's right. Very well. Yes. May it please the Court. I'm Sandy Forbes, also known as Jenny Forbes on the record. And I'm here to argue the case. I have with me the State's Assistant Attorney General Ann Hobart in the event the court has any questions for the State's counsel. And we knew this would be a lively debate this morning. Our position, of course, is that given the standard of review for the issue of the punitive excessiveness, alleged excessiveness of punitive damages, that if the court reviews de novo, the district court's determination, but also that the court has an obligation to defer to the factual findings of the district court absent clearly erroneous determinations. Here's what troubles me in this case. And I'm having difficulty figuring out how we figure out, assuming that we're not stuck to a 1 to 10 ratio. If we are, the case is easy. But if we're not stuck to a 1 to 10 ratio, how do we figure out what the right number is? That is a quandary, Your Honor. And I admit that it's a quandary. Tell me how I solved it. I don't know. I think the way to resolve this is to look at the way that the district court analyzed the case. And if, obviously, the court felt that the appropriate analysis was to start with the $800,000 punitive damage amount, and then the cap is just an automatic application. And so I think if you're, if you're. So why is $800,000 appropriate in this case? Well, because essentially of the reprehensible nature. $850,000 to 1. I'm sorry. It's $850,000 to 1. So tell me why it's appropriate in this case. Well, in this case, you know, even in the BMW v. Gore case, the statement was made that when you have a smaller amount of damages, that this proportionality argument becomes far less important. And I understand. Here's, maybe I'm not clear enough. I want to give you a chance to play this out. But I want to. I understand that we, that the 1 to 10 may not work with small damages and nominal damages. And certainly our Mendez case, which was not a Title VII case, but a 1981 case, suggests that. My question is, we're doing this case de novo. And you got $850,000 in punitive damages and the judge reduced it to $300,000 because the statute requires it. De novo, tell me how we determine whether that was the right amount. Well, de novo, you look at the same BMW v. Gore factors, but you give additional weight to the cap, the consideration of the Title VII cap as an indication that it's not necessary to apply a strict ratio. And that if under Title VII you were, the reprehensible nature of the conduct, which is really, it's focused on the employer's conduct and what the employer did or did not do, which I believe is what Judge Singleton was talking about in particular, that looking at that conduct, if the level of reprehensibility in terms of the violation, the conduct which violated Title VII justifies a higher award, even in light of nominal damages or very low compensatory damages, then I think the ratio becomes far, far less important and maybe evaporates. I'm not suggesting that this Court adopt Abner in full, all right, because basically what Abner says is once you've met the standard under Title VII for punitive damages, which is the standard of reckless malice or reckless indifference to the federally protected rights of the individual, that once you've met that, you know, the jury can basically award anything in punitive damages up capped at $300,000. I'm not sure that Abner says that. What Abner says is that given the cap and the advance notice to defendants, that that's the maximum fine. Ratio analysis is not important. Abner doesn't say once you find reckless indifference, the jury is free to award any amount and we're okay with that. We still have to review it to see whether de novo it's the right amount. Well, I'm not sure. I think the Court does have to review it, and that's why Abner is not a case that this Court should adopt. In other words, I'm not sure you characterized Abner correctly, but we're still stuck with this issue. Help me determine why in your case $850,000 reduced to $300,000 is a constitutionally appropriate amount, assuming that we're not bound by strict ratio analysis. Tell us what there is about this case that makes it that bad. Because of the findings that the Court made concerning reprehensibility, the fact that there was maybe some physical conduct on the part of that first individual who harassed her. But even beyond that, when you talk about non-economic versus physical damage, which is what that first kind of subset of the State Farm analysis and Baines analysis under the reprehensibility, when you look at that, the affront to personal dignity that is evidenced by the conduct that was directed to Angela Aguilar in this case certainly should count for a – should count a great deal under that rubric. Then – Now, apply Mendez to that analysis. Where does Mendez fit in your approach? I think Mendez is not – Mendez is helpful in the sense that it indicates that under this kind of a circumstance, the ratio is far less important and maybe evaporates completely. But Mendez is a very different case than the case we have here. In Mendez – Title VII. I'm sorry. It wasn't Title VII. No, it wasn't Title VII. But even beyond that, I think that there is a misinterpretation in Osarco's papers about what Mendez was all about. Because in Mendez, it wasn't an issue of the wrongful death of the son. It had to do with the treatment of the mother and the family. And so it had to do with the legal search and seizure, and it had to do with a failure to translate and to communicate, and keeping them overnight. So it was a bit of a false arrest, a fairly short term. The court in that case, the lower court, found that there wasn't any malice involved. It was more like a negligence. It amounted more closely to negligence than to any reckless indifference. And the difference here is we do have reckless indifference. We have a company. You're not saying we have malice in this case, are you? I'm sorry, Your Honor. You're not saying that we have malice in this case, are you? No. I'm not saying that except that the judge, the trial judge in this case, in looking at the jury verdict and the post-trial motion, said, implied that it almost amounted to malice. And the truth is, if you look at the conduct of the company in its complete failure to investigate any complaint that Angela Aguilar made over a period of many months about different kinds of harassment that she experienced, I mean, it just completely ignored her. And yet, Your Honor, when a male employee complained a couple of months after Angela was left the company, he was actually, his complaint about Julia Julio Esquivel, who was one of the people who was targeting our client, his complaint about Esquivel was investigated, and Esquivel was disciplined. And that's in this record? Yes, it is in the record, Your Honor. I take your point that Mendez is different because the claim in those cases was only for the false arrest and false search, not for the death of the son. Give me your best comparable case. I don't know that there is a best comparable case. Aren't we instructed by the Court, the Supreme Court, that part of our job here is to make sure that penalties are in some sense roughly equal? Comparable cases? I think it's very difficult in this area of the law to find comparable cases. And frankly, I don't think either side has been able to find a comparable case. That's why I'm asking. That would provide any instruction whatsoever. But I do think that perhaps the comparability comes in, in the idea of the Title VII cap, because there are cases which look at the cap in the context of 1981 cases and 1983 cases which find the cap as providing guidance for, you know, as part of that civil or criminal penalty. So they're looking to the cap. And those are the Swinton case and also Zhang. They saw the $300,000 cap as an analogous sanction. And in Zhang, the Court made the comment about it was a legislative judgment similar to a fine. So if that's the case, if that, if in a case involving 1981, 1983, the $300,000 cap can be viewed as under that third prong of BMW v. Gore, I certainly think it ought to be looked at as a comparable penalty, kind of a comparable penalty in this case as well. Now, counsel, the major problem I'm having with this is there are a number of Title VII cases when people similarly situated to your client have gotten damage awards not for physical contact, but for mental and emotional injury of $100,000, $150,000, $200,000. If Ms. Aguiar had gotten damages of $250,000 for mental and emotional harm, then her cap for punitive damages would have been $50,000. That's very difficult for me. Secondly, you know, you almost can characterize in the jury's eyes Ms. Aguiar's case as a whistleblower. They found she suffered no damage as a result, and yet there are numerous people suing under Title VII who suffered all kinds of damage. How can we say that to max out the punitive damage award in her case is appropriate, where it wouldn't be in all these other cases? Well, I think there are two issues. As to the first question that you were talking about, the – well, that, I think, goes to, you know, if you have an award of, say, $250,000 that you were talking about in compensatory, and you can only get another $50,000 under the cap, that really is an issue about the wisdom of the cap. That's why we look at the real punitive damages award. Yeah. Right? As opposed to the – as opposed to what you actually recover. Yes. In other words, it may only be eligible for $50,000 in a case like that, but the award may have been a million, and we don't know. We don't have it in front of us. That's exactly right. And I think that – I mean, I realize that it causes consternation, but I do think it goes to the wisdom of the cap. And maybe, you know, the cap is set for an employer of 500 or more. Well, the truth is, SARCO had, in this area, 1,400 employees, and it's got even more employees elsewhere. So, I mean, you know, why don't we have a cap that kind of goes up even beyond 500? But Congress has chosen that. So I'm still struggling. Judge Singleton is struggling, I think, and perhaps it's a hard question to answer in this case. You've got a case in which your client didn't suffer any actual damage, but prevailed, and she got an $868,000 punitive damages award. The law required the judge to reduce it at least to 300,000. Why is that the appropriate number? That's what I'm still – I understand we're going to have this problem in every case where we have punitive damages, but tell me why that's the appropriate number as it's – for example, if the judge had said, no, I think $100,000 is right in this case, I'm not sure that would have troubled me. So I'm just trying to figure out why it is that 300,000 is the appropriate number, or 867 is the appropriate number. Well, as Your Honor pointed out, though, I mean, he looked at, really, the 800,000 rather than 300.  So why was that appropriate? And I think it was appropriate because it – he believed, and I think it's true, that he had to perform the BNW analysis. And he did that on the – he did it – he looked primarily at the reprehensibility, and you have all his findings on that, and I think they're appropriate. And they've not been shown to be clearly erroneous. The other thing is that Title VII is unique in a way because the 1991 amendments that are found in 1981A, they don't – they indicate by their language that you can have a minimal compensatory damage or – it doesn't talk about nominal damages, but you can't – you can have either a minimal compensatory damage award or none at all. And you can still be entitled to punitive damages. No, and I accept that. I understand – I understand that the hardy plaintiff, if you will, shouldn't – can bring a Title VII case. She may suffer no physical or emotional damage, but nonetheless, the conduct has been very bad. And maybe it's an unanswerable question. I haven't gotten an answer yet, but I'm just trying to figure out – assume all that. Why is this an $867,000 case as opposed to a $100,000 case? Well, I think part of the answer is that it's the kind – the kind of offense that we're talking about here is an offense against personal dignity. And it's really an affront to personal dignity and the integrity of the individual. And so there are times when that kind of damage is difficult to quantify. And I think that may have been what happened here. I don't know. We can speculate forever about why the jury reached the decision that it did. But it clearly thought that Sarko's conduct was sufficiently reprehensible that it awarded the $800,000, the $800,000-plus. And so it seems to me that if you – there is a – there is a possibility that the jury made an assumption that she – that because she did get that nominal damage award, even without a compensable – a compensation award by the jury, that there was harm done. She was the victim of sexual harassment on these various – through these various scenarios. And the worst thing was, in the jury's view, apparently, that it was the conduct of the company in letting this conduct persist and not addressing it that really was at the heart of their award. And so I think that – you know, Title VII is a scheme that is very different from, say, tort law, for example. I mean, we're talking about a higher threshold to find punitive damages in a Title VII case. We're not talking about willful wanton conduct. We're talking acting in – with malice or reckless disregard of an individual's federally protected rights. And so even if the individual's harm may be difficult to quantify, certainly a jury can find that the company's response to this really made the situation worse and therefore ordered or awarded a large amount in punitive damages. I mean, I don't have the answer to all of this, but I think that the district court's guidance on this, and it was – it really was a very well-reasoned opinion and well-supported by the facts, which haven't been shown to be clearly erroneous. Scalia. Counsel, what troubles me is that if we agree with your position that the appropriate amount of punitive damages even under Gore is 300,000, that will be the largest punitive damages award approved by a court since Gore. And it raises some troubling concerns about just how far one can go. Do you have a suggestion that something between 300 and, let's say, 2,500, which we, let's say, assume is the floor, and 300 would be your tentative ceiling, what's in between that would make sense in this case? I don't have a suggestion, Judge. And I've certainly gave that some thought. My feeling is that in a case like this, if the court determines that this result is not appropriate under these circumstances or under BMW v. Gore, I believe that it would be appropriate to give the district to remand to the district court with instructions about what should be considered and why this court determined that the result or the court's review below of the excessiveness somehow missed the mark. But if our review is de novo and nobody contests, or at least for purposes of this we accept all the facts found by the district judge, if we thought the amount was too high, wouldn't it be our obligation to set the right amount? In other words, the judge's eventual finding would be reviewable by us again de novo. So I'm not sure what's gained by remanding. No more facts need to be found. Well, I guess my thought about the remand was it would give guidance. I mean, it is an unusual case. I freely admit it. And I think counsel would freely admit it. It seemed to me that the judge, the district court judge, properly applied the law. And so it, I mean, that's of course our position. If the court believes that the he did not properly apply the law, then I think it's important for this Court to instruct the lower courts about why that is inappropriate. Can I ask one question? Go ahead, certainly. If this Court concludes that the punitive damage award must be modified, must we then, to be consistent, remand the issue of attorney fees to the trial court to be recalculated in light of whatever the ultimate award is? I don't believe so, Your Honor. And the reason for that is that even the Mendez case is instructive in that regard because in Mendez there was that reduction from the $250,000 to $2,500,000. And in that case, the lower court had denied attorneys' fees in part, in large part, really because of the really excessive fee amount. It was something close to $800,000 in fees. But the court directed that on remand that the lower court consider an award of fees and made, and the ruling indicated that it would be appropriate under the circumstance to make an award of fees. Oh, no, I'm not asking that. Assuming that the court properly awards fees, must the court not under Farrar and the other cases take into account the actual award to the plaintiff in determining the amount of the fees? Isn't that a factor that they have to consider? And if you modify the one, must you not at least consider modifying the second? I don't believe so. And the reason I don't believe so is that we're looking. Plaintiff or plaintiff-intervenor in my client would be the prevailing party under Farrar v. Hobby. No question about it. And we, I mean, the court has shied away from the proportionality analysis with respect to attorneys' fees versus punitive or compensatory damage awards. Did the trial judge take the amount of the punitive damages award into account in awarding fees? He really did not. He, it was, he didn't make any comparison or really discuss the, any comparison. And the point is, we were the prevailing party, and even if the amount is reduced, we would still be the prevailing party. And the truth is, the fees that were incurred and that were awarded were awarded on the sexual harassment claim for punitive damages. And that was, that was part of a, is a common core of operative facts, even with the retaliation claim. So those fees were really, they were earned on the sexual harassment complaint, the claim. Thank you, counsel. We've taken, our questions have taken you way over time. Thank you. Mr. Barton, you have some reserved time. Thank you, Your Honor. Very quickly, I want to correct one thing. We did address the clearly erroneous finding of the court on the fee issue in our briefs. I dug that up and found it. Let's get back to the constitutional question here, which I think is the interesting one. First of all, if this Court does not find that the admission of the evidence in error was the cause of the punitive damage award, then you have to address the constitutional issue, which is how should the court adjust the award. And the Court is correct that this is a de novo review. This Court needs to fashion an appropriate award and has the power to do so. So how do you go about doing that? Well, first of all, if the defendant is aware of receiving a punitive damage award, then the maximum award that the defendant will conceptually do process is all about notice, correct? So if the most that a defendant could ever be aware of receiving in a punitive damage award or a compensatory damages award or any damage award is $300,000, then the most that a defendant could expect to succumb to in some kind of a jury verdict is $300,000. So that's got to be the starting point, because if the gravamen is notice, then the only notice possible is the maximum award I'm going to ever receive is $300,000. So let's assume that Arizona had a statute that said, and it does, let's assume Arizona had a statute that actually had a penalty in it that said if you do what you did in this case, and I know you don't think you did anything wrong, but assume that you did what you did in this case and the penalty is up to $300,000, would that have any constitutional problems? Well, again, if it put the people on notice. Sure. I'm asking you to posit in an Arizona statute that said for conduct, and it describes the conduct that the jury found in this case, injunctive relief may be issued and the defendant may be penalized up to $300,000. Would that have a constitutional problem if you, and the judge imposes the $300,000 award? In a case like this, it would, because the notice has to be coupled with the harm. In other words, it's not just enough to say, okay, the maximum is $300, so therefore in every case I'm going to award $300,000. The other component of the notice is what did I do? And that's why the Court in Gore says you've got to look at not only the conduct of the defendant, but the third component, these statutory or caps or other costs. And I guess where I'm having some difficulty is what, when the penalty called for by the jury is in excess of $300,000, I'm not sure that $300,000 is the starting point. It is the statutory area we must reduce it to. So I'm not sure there's an answer to that. That's why I'm struggling on both sides of this. Roberts. Counsel, you heard our questions to your opposing counsel about how we should go about trying to figure out what that number is, somewhere between 300 and, let's say, 2,500. Can you offer any guidance that would be useful here? Yes, I can. Again, the $300,000, in our view, is the maximum amount a plaintiff in a Title VII case can ever recover. So that has to be saved for the most egregious of cases. It has to be the maximum amount that you could award in a case where facts are truly horrendous. So then, using the third Gore guidepost, starting with that and saying, okay, that's the max. We're going to have to now look at our comparable cases and say, how does this case compare to the other punitive damages, jurisprudence that we have in this circuit to decide where does it fit on that reprehensibility scale? And that's where Mendez comes into play. So in Mendez, you took very egregious facts. Let's just kind of review them very quickly. A mother sees her son shot in her neighbor's driveway. He's a deaf mute. Instead of being able to go see him, she's put into a police vehicle where she has to sit on a hot July evening for several hours. She's then dragged to the police station without being arrested where she has to be interrogated until 3 in the morning. And she's told, she asks during that time to go see her son, and she's denied. They then, under false pretenses, get her to sign a document that authorizes them to go search her home. She returns home and finds the police in her home ransacking that home. And only then is she told that her son, who they denied her the privilege of going to see while he died, has died. Those are pretty reprehensible facts. So if you compare that with what happened here, you have to say, all right, this isn't quite as reprehensible as that. So if we're going to award punitive damages, it has to be something less than what we did in Mendez, reduced the $250,000 award to $2,500. We're going to set the number at $2,000. Is there a comparable Title VII case in your view? There is not a comparable Title VII case. There are some Title VII cases involving $300,000 punitive damages awards, are there not?  In fact, that was the Abner case we talked about, which said, you know, you just throw it out. But that doesn't work for a host of reasons. It doesn't leave you any ability to fashion an appropriate punitive damage award in a case worse than this. Let me ask you one more question with Judge O'Scallion's permission. I want to go back to Judge Singleton's question before and turn it around to you. Let's assume you had a case in which a jury found a million dollars in compensatory damages and a $500,000 and then awarded 10 times that, $10 million in punitives. The award would still only be $300,000, right? That's correct. And so why is it then that we begin with $300,000 in terms of analyzing the punitive damages award? Surely you'd agree in that case that the award was constitutionally permissible. It just wasn't statutorily permissible. That is correct. Because this Court has a duty to review de novo the punitive damages award for constitutionality. For constitutionality. Don't we do that before we apply the $300,000 cap? That's my question. We look at it for constitutionality is not statute. We figure out whether it's constitutional first, and then we apply the $300,000 cap. And that's, again, maybe this is a speech rather than a question. That's why I'm having trouble with your argument that we start with $300,000 and $300,000 is the worst case in the world and then we factor down. We start with whatever is constitutional and then we oppose that $300,000 cap on it, don't we? We used to – well, no, Your Honor. Let me try to explain why I don't. I can't imagine the Court would do that. And here's why I'll explain. In Title VII cases, which is what this is, again, the maximum you're ever going to be able to give is $300,000. Reprehensibility is the key component of evaluating a punitive damages claim and deciding how much is appropriate on a constitutional basis. Is that right? You think $300,000 – you think Congress told us that $300,000 was the maximum constitutional award available? Or did it just say, in our discretion, we want to limit damages in a statutory cause of action? Well, I think – I think Congress does have a duty to uphold the Constitution, obviously. Why they imposed the cap, I can't speculate. But this much I can say. That is the maximum this Court will ever be able to award. And so if the Court is going to be able to look at these various cases that come with all differing types of facts and put them on a scale of reprehensibility, if it says in this case that that's the $300,000 case, then there will never, ever be a case that is entitled to less. And that's a problem for this Court. The Court has to leave itself some room, based on its comparable cases, to allow for more egregious facts to get a more constitutionally proportional award. Thank you, counsel. The case just argued will be submitted for decision, and the Court will adjourn. Thank you, Your Honor.
judges: Singleton, O'scannlain, Hurwitz